983 So.2d 776 (2008)
Jay KUCHERA, Appellant,
v.
Claire Rice KUCHERA, Appellee.
No. 4D06-1957.
District Court of Appeal of Florida, Fourth District.
June 18, 2008.
*777 Philip M. Burlington and Andrew A. Harris of Burlington and Rockenbach, P.A., West Palm Beach, and Michael P. Walsh, P.A., West Palm Beach, for appellant.
Joel M. Weissman of Joel M. Weissman, P.A., West Palm Beach, for appellee.

CORRECTED OPINION
FARMER, J.
In this divorce the trial court decided that a marital settlement agreement is not enforceable. We conclude that the agreement is binding and governs the rights and obligations of the parties upon divorce. Consequently on the cross appeal, we reverse the monetary and property provisions of the final judgment of dissolution of marriage and return the case for changes made necessary by that agreement.
Since the parties married in 1984, they have engaged counsel on three occasions and twice initiated legal proceedings for a divorce. In 1991 they separated and each sought separate counsel. While thus represented they negotiated and entered into a Marital Settlement Agreement (MSA) without filing formal proceedings in court. Their MSA contemplated reconciliation but contained unconditional provisions relating to specific distribution of property, for alimony and support, fees and costs, and *778 provisions for the survival and enforcement of the agreement after reconciliation.
The text of the MSA is revealing: "The purpose of this Agreement is to effect a complete and final settlement, with reference to each other of all the respective property of the parties and for any and all support obligation between the parties." After detailing specific provisions for equitable distribution of identified property and the amounts of lump sum alimony, paragraph 13 of the MSA sets out these explanatory provisions (among others):
A. Reconciliation shall not abrogate the provisions of this Agreement relating to the parties' property rights and support.
. . .
D. Each party shall own, free and clear of any claim or right of the other, all of the items of property, real, personal, tangible or mixed, which under this Agreement, will be owned by him or her or to which either of them may be beneficially entitled, with full power to dispose of it.
. . .
F. The parties agree that neither one has the right to modify this agreement whatsoever. The alimony provisions in this agreement are pursuant to the relinquishment of certain valuable property rights and are non-modifiable by either party. Whether the parties ever have a substantial change of circumstances is immaterial. The parties acknowledge that they waive their right to modify said alimony provisions whatsoever.

G. All provisions of this Agreement are enforceable by contempt whether or not the Court may interpret it as a non-modifiable property settlement agreement, the parties desire to use its contempt powers to enforce this agreement if one of the parties, for whatever reason, desires not to comply with it.
H. On the effective date of this agreement, the parties shall and do mutually remise, release, and forever discharge each other from any and all actions, suits, claims, demands or claims whatsoever, in law or in equity, which either of them had or has or may hereafter have against the other upon or by reason of manner, cause or thing existing up to the date of this agreement, it being the intention of the parties that after the effective date of this Agreement, there shall be between them only such rights and obligations as are specifically provided for herein, including but not limited to rehabilitative alimony, lump sum alimony, special equities and equitable distribution. [e.s.]
Nothing in the MSA specifies that the failure to carry out or enforce a provision after reconciliation would result in a mutual abandonment of the entire agreement.[1]
The husband next filed an action for dissolution of marriage in 1993. Again the parties were represented by counsel. They actively pursued the case through counsel for more than a year. In time, they again decided to reconcile. Nonetheless they filed an agreed motion for court approval of the 1992 MSA. In 1994 the court entered an order approving the MSA. No final judgment was ever entered in the 1993 action, the parties deciding not to end their marriage at that time.
Several years later, after the birth of two additional children, the parties again separated. In 2003 she filed a petition for dissolution of marriage. In this last action, he contested the validity of the 1992 MSA which the court had approved in *779 1994. He argued that it was the product of "gross overreaching" and was unconscionable as a matter of law. She argued that the validity of the MSA was established by the 1994 order specifically approving the agreement. Neither spouse had ever challenged that order, she asserted, and its validity must therefore be taken as established.
After a pretrial hearing on the husband's objections to the validity of the MSA, the trial judge issued an order with findings and conclusions of law. Judge Kroll analyzed the agreement under the decision in Casto v. Casto, 508 So.2d 330 (Fla.1987). She found no duress or coercion as claimed by the husband. Judge Kroll did express "concern", however, about "the gross overreaching of its [effect] causing an unconscionable result." As she explained in her order:
"The net result of the application of this agreement would be to create a servant of the Husband to the Wife. This is a court of [equity] which cannot allow this result. The Husband did not just make a bad bargain. In this case he would be penalized by the enforcement of the terms of the contract so that no decent, fair-minded person would view the end result without being possessed of a profound sense of injustice. See Steinhardt v. Rudolph, 422 So.2d 884 (Fla. 3d DCA 1982). Also See: Tenneboe v. Tenneboe, 552 [sic-558] So.2d 470 (Fla. 4th DCA 1990).
"Even if the agreement were found to be sound, it would be against public policy to allow enforcement of the agreement where it was so obviously abandoned in this case. Since the parties signed the agreement they sold the home and the vehicles described and had two additional children. They failed to divide their accounts or deal with their finances as prescribed in the Agreement. The Court finds the agreement invalid."
The case thereafter proceeded to trial before Judge Cook, whose final judgment we now review.
For two reasons we conclude the trial court erroneously held the MSA invalid. The first lies in the plain text used in the MSA. It expressly states that it is final and is not modifiable by either of them. ("The parties agree that neither one has the right to modify this agreement whatsoever.") It explicitly says that it is intended to cover "any and all" obligations between them and makes clear that any future reconciliation would have no effect on the agreement. ("Reconciliation shall not abrogate the provisions of this Agreement relating to the parties' property rights and support.")
In particular they emphasized the alimony and equitable distribution, specifying that the alimony provision resulted from the other provisions and was not modifiable. ("The alimony provisions in this agreement are pursuant to the relinquishment of certain valuable property rights and are non-modifiable by either party. Whether the parties ever have a substantial change of circumstances is immaterial. The parties acknowledge that they waive their right to modify said alimony provisions whatsoever.") If that provision were not clear enough, they added other text stressing the finality of the alimony provision. (". . . it being the intention of the parties that after the effective date of this Agreement, there shall be between them only such rights and obligations as are specifically provided for herein, including but not limited to rehabilitative alimony, lump sum alimony, special equities and equitable distribution.") To put an even finer point on finality, they included an express provision making each of them responsible for one's own attorney's fees. *780 Each thus explicitly waived the right to have the other pay for future litigation about support and property rights.
There is still another facet about the agreement underlining their intention that it be effective no matter what. Although it was fully executed in 1992, they did nothing then to formalize their agreement in court. When he filed a petition for dissolution of marriage a year later, they proceeded through counsel to litigate that case for more than another year. Again they decided to reconcile. This time, however, they nevertheless insisted on submitting their 1992 MSA to the court and having the trial judge approve its validity. They were unwilling even then to reconcile without a court order making a formal declaration that their MSA is valid. There can be no doubt from this act that they were determined to have the MSA govern their future relations and to be fully enforceable even though they decided then not to divorce. This strongly evidences their intention that the resulting validity determination has special force to govern their future relations no matter what happens.[2]
Second, even if the 1994 validity determination were not properly governed by res judicata or collateral estoppel, we conclude that the trial judge considered its validity under the wrong legal standard. Casto held that a postnuptial property settlement agreement outside of litigation may be challenged for fairness. But after litigation has been pursued, the governing standard for a settlement agreement is not the one employed in Casto.[3] Litigation settlement agreements are judged, rather, by the later standard in Macar v. Macar, 803 So.2d 707 (Fla.2001), and this court's decision in Petracca v. Petracca, 706 So.2d 904 (Fla. 4th DCA 1998). Macar holds that, when each party has been represented by chosen counsel and given an opportunity to learn the financial resources of the other through litigation discovery, settlement agreements made in that context may not be challenged for fairness. Macar expressly approved this court's reasoning in Petracca, which had explained:
"The parties alone are competent to say what is reasonable to resolve a lawsuit and what is not. If parties choose to settle a case without fraud or coercion after adequate opportunity to engage in discovery  from which ample knowledge must be presumed  they should not be heard to assail the relative fairness of the bargain. If they agreed to the terms, it is presumptively and conclusively fair as a matter of law."
706 So.2d at 912. Macar added:
"The incentive to file an action, impulsively settle, then challenge the settlement after final judgment would permit parties to manipulate the privileges of litigation, waste judicial resources, and compromise finality in these judgments."
803 So.2d at 713.
In this case Judge Kroll found the agreement too unfair to enforce, saying it would make the husband a servant of the wife if its provisions were carried out. Respectfully, even if fairness were a proper consideration, we think she has read much *781 too much into the effects of the agreement. The MSA recites that in 1991 he made over $370,000 a year. It provides that for 10 years, he would pay her lump sum alimony equal to half the remainder of his income after child support. At the end of 10 years, the amount is reduced to $10,000 yearly.
In the final judgment we now review, Judge Cook found that he currently has a net income from his practice in excess of $45,000 monthly, and that in recent years he has actually generated income between $500,000 and $800,000 per annum. For those who can reliably earn this level of income, the MSA does not strike us as patently unfair. These figures do not leave us with any sense of injustice or strike us as punitive. Paying her half of his net after child support does not seem especially onerous. Many marital couples split their income equally even if earned by only one of them. There is nothing so manifestly unjust for alimony purposes about an equal sharing of income after a long term marriage. Being an equal partner in a voluntary alimony agreement does not inevitably make one the forced servant of the other. Moreover, his obligation is substantially reduced after 10 years. We cannot agree with the trial judge's reasoning that this MSA is legally unconscionable or that equity should categorically refuse to enforce it.
We therefore return the case for consistent proceedings. Because of transfers and substitutions regarding the property listed in the MSA, the trial court shall have discretion to consider issues raised by either party to carry out the intent manifested in the MSA. The additional children require an appropriate adjustment in the amount of child support and so we affirm the child support provision in the final judgment. We also affirm the trial court's geographic restriction on relocation. And we affirm the denial of attorneys fees to either party, their MSA explicitly providing that each shall bear the party's own fees.
WARNER and GROSS, JJ., concur.
NOTES
[1] We also note that the MSA was executed with all the formalities, including witnesses and acknowledgements before notaries public, becoming effective May 1992.
[2] For these reasons, we reject his contention that the failure to separate the property after their second reconciliation establishes a waiver or abrogation of the agreement.
[3] Tenneboe v. Tenneboe, 558 So.2d 470 (Fla. 4th DCA 1990), concerned a marital settlement agreement, one reached without counsel, and was properly decided under Casto. But the other authority cited by Judge Kroll, Steinhardt v. Rudolph, 422 So.2d 884 (Fla. 3d DCA 1982), concerned a 99-year recreation facility lease by a developer to a condominium association. Neither case is authoritative for the issue we confront in this case.